UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| AMPELMANN OPERATIONS B V | CIVIL ACTION NO. 6:24-CV-1668 |
| VERSUS | JUDGE ROBERT R. SUMMERHAYS |
| ATLANTIC OCEANIC UK LTD, ET AL. | MAGISTRATE JUDGE DAVID J. AYO |

## RULING

The present matter before the Court is a Motion to Vacate Vessel Arrest and for Expedited Hearing [ECF No. 11] filed by defendants, Atlantic Oceanic UK LTD. ("Atlantic Oceanic") and the ATLANTIC TONJER ("Atlantic Tonjer" or "Vessel"). Defendants request that the Court vacate the arrest of the Vessel or quash the arrest warrant issued for the Vessel. Plaintiff Ampelmann Operations B.V. ("Ampelmann") opposes the motion.

### I.
### BACKGROUND

This dispute arises out of a gangway system supply contract entered into between Ampelmann, the gangway system supplier, and Defendant Atlantic Oceanic, the Atlantic Tonjer's charterer. Ampelmann is a company formed and doing business in the Netherlands.[1] Atlantic Oceanic is a company organized under the laws of England.[2] The Vessel is owned by a company existing under the laws of the Republic of Seychelles[3], and is registered in Panama.[4] At all relevant times, the Vessel has been and is currently under charter to Atlantic Oceanic.[5]

On February 23, 2024, Ampelmann (as "Owner" of the equipment) and Atlantic Oceanic (as "Charterer" of the equipment) executed a "Time Charter Party for Offshore Support Vessels"

---

[1] ECF Nos. 1 at 1; 11 at 1-2.
[2] *Id.*
[3] ECF No. 11-4 at 2.
[4] ECF Nos. 1 at 1; 11-4 at 2.
[5] ECF No. 11-4 at 2.

(the "Charter Party") under which Ampelmann would provide a gangway system and pedestal (collectively, "the System") to Atlantic Oceanic for a period of one hundred eighty (180) days, in exchange for a daily rate of hire, among other fees, costs, and reimbursements.[6] The parties agreed that Ampelmann would deliver the System at the Port of Fourchon, Louisiana.[7] The designated place of contract was Houston, Texas.[8]

The Charter Party includes choice-of-law and lien provisions. As to choice-of-law, Box 33 ("Dispute resolution") of Part I of the Charter Party directs the parties to "state (a), (b), (c), or (d) of [Clause] 37, as agreed," and here the parties chose subclause (d).[9] Clause 37 ("BIMCO Dispute Resolution Clause 2016") of Part II of the Charter Party explains the effects of choosing the various subclauses. Subclause (a) would have made the Charter Party "governed by and construed in accordance with English law" and would have required arbitration of disputes arising from or in connection with the Charter Party in London.[10] Subclause (b) would have made the Charter Party "governed by U.S. maritime law or … by the laws of the State of New York," and the parties would have had to refer disputes to arbitrators in New York.[11] Subclause (c) would have made the Charter Party "governed by and construed in accordance with" either Singapore or English law, and required arbitration of disputes in Singapore.[12] By contrast, subclause (d)—*the subclause chosen by the parties here*—does not itself designate the applicable law or place of arbitration, but requires the parties to expressly elect the applicable law and forum. Specifically, the subclause selected by the parties states:

---

[6] ECF No. 1-2 at 2-4.
[7] *Id.*
[8] *Id.*
[9] *Id.* at 5.
[10] *Id.* at 32-33.
[11] *Id.* at 33.
[12] *Id.* at 33-34.

> This Charter Party shall be governed by and construed in accordance with the laws of the place mutually agreed by the Parties and any dispute arising out of or in connection with this Charter Party shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there.[13]

Returning to Box 33 of Part I, the Charter Party states "if (d) agreed also state the place of the law governing the Charter Party and place of arbitration." As to the applicable law, place of arbitration, and procedural rules, the parties chose: "(d) Dutch law. Rules of arbitration procedure: UNUM. Place of arbitration: Rotterdam, the Netherlands."[14] In short, the parties selected Dutch law to govern the Charter Party and selected arbitration in Rotterdam as the method and forum for resolving disputes under the Charter Party.

With respect to the creation of liens, Clause 19 ("Lien") of Part II states (underlining and strikethrough in original):

> The Owners shall have a lien upon <u>the Vessel</u>, all cargoes, fuel and equipment owned by the Charterers for all claims against the Charterers under this Charter Party ~~and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned~~. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the <u>System</u>~~Vessel~~.
>
> Should the Vessel <u>and/or System</u> be arrested by reason of claims or liens ~~arising out of its operation hereunder, unless brought about by the act or neglect of the Owners~~, the Charterers shall at their own expense take all reasonable steps to secure that ~~within a reasonable time~~ the <u>System</u>~~Vessel~~ is <u>immediately</u> released and at their own expense put up security to release the <u>System</u>~~Vessel~~. Except as provided in Clause 14 (Liabilities and Indemnities) and unless brought about by the act or neglect of the Owners, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel <u>and/or the System</u> during the Charter Period ~~while it is under the control of the Charterers~~, and against any claims against the Owners arising out of the operation of the <u>System</u>~~Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation thereof~~.[15]

---

[13] *Id.* at 32-24.
[14] *Id.* at 5.
[15] *Id.* at 22.

The System was delivered at the Port of Fourchon on approximately April 15, 2024, and was installed on the Vessel.[16] Ampelmann alleges that Atlantic Oceanic has failed to pay all sums owed under the Charter Party, despite demand for payment, totaling more than one million dollars ($1,000,000).[17]

On December 5, 2024, Ampelmann filed a Verified Complaint in this Court, asserting a claim against the Vessel, *in rem*, and a claim against Atlantic Oceanic, *in personam*.[18] Ampelmann argues that Atlantic Oceanic has breached the Charter Party through nonpayment, and because the System constitutes a necessary, Ampelmann possesses a maritime lien against the Vessel under the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31342.[19] Accordingly, Ampelmann seeks the following relief: (1) seizure of the Atlantic Tonjer under Rule C of the Federal Rules of Civil Procedure's Supplemental Rules for Certain Admiralty and Maritime Claims; (2) recovery of the amounts owed under the outstanding invoices from all relevant parties; (3) damages for breach and fault (including lost profits, legal fees, and all other recoverable fees); and (4) all custodial costs.

Ampelmann moved for a warrant to seize the Vessel,[20] which was issued on December 17, 2024.[21] The Court also granted Ampelmann's motion to substitute Babin Transportation, LLC as custodian in place of the U.S. Marshal after seizure.[22]

On December 24, 2024, Atlantic Oceanic filed the present motion to vacate the seizure of the Vessel.[23] Atlantic Oceanic argues that the Charter Party's chosen law—Dutch law—does not

---

[16] ECF No. 1 at 2-3.
[17] *Id.*
[18] ECF No. 1.
[19] *Id.* at 2-3.
[20] ECF No. 2.
[21] ECF No. 9.
[22] ECF No. 10.
[23] ECF No. 11.

recognize a maritime lien for the provision of necessaries, so Ampelmann has no valid maritime lien which can be enforced by seizure under Rule C.[24] Alternatively, Atlantic Oceanic argues that a maritime lien for provision of necessaries only arises from when they are provided to a specific vessel, and the Charter Party hires the System to Atlantic Oceanic generally, not the Vessel in particular.[25] Atlantic Oceanic asks the Court to (1) quash or vacate the seizure of the Vessel, (2) hold an expedited hearing on the motion, and (3) issue a temporary order that the Vessel not be moved pending further Court action.[26] A magistrate judge set a motion hearing for the afternoon of December 26, 2024, and ordered that the Vessel not be moved pending further court action.[27] The magistrate judge also set a status conference for the morning of December 26.[28]

On December 25, 2024, Ampelmann filed an opposition to the motion, arguing that its maritime lien arises out of operation of United States law, and alternatively the Charter Party grants Ampelmann a lien on the vessel.[29] Ampelmann further argued that evidence shows the System was intended by the parties to be provided to the specific Vessel, even if that was not memorialized in the Charter Party.[30] On December 26, 2024, prior to the status conference, Atlantic Oceanic filed a reply responding to Ampelmann's arguments.[31]

At the status conference on December 26, 2024, the parties agreed to stay the arrest and seizure and not to move the Vessel or any of her assets until a hearing could be held before this Court.[32] The magistrate judge entered an order giving effect to those agreements the same day.[33]

---

[24] ECF No. 11-1 at 3-5.
[25] ECF No. 11 at 6-9
[26] ECF No. 11.
[27] ECF No. 12.
[28] ECF No. 13.
[29] ECF No. 14.
[30] *Id.*
[31] ECF No. 16.
[32] ECF No. 17.
[33] ECF No. 18.

This Court subsequently held a status conference with the parties and set a motion hearing for January 15, 2025.[34] The parties agreed to submit additional briefing,[35] and the Court heard argument from the parties at the hearing.[36] As of writing, the warrant has not been executed and the Vessel has not been seized, though the order that she not be moved remains in effect.

## II.
### MOTION TO VACATE STANDARD

Under the Federal Rules of Civil Procedure, Supplemental Admiralty and Maritime Claims Rule C, an *in rem* action may be brought to enforce any maritime lien.[37] Specifically, Rule C provides, in part:

> An action in rem may be brought:
>
> (a) To enforce any maritime lien;
> (b) Whenever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto.
>
> Except as otherwise provided by law a party who may proceed in rem may also, or in the alternative, proceed in personam against any person who may be liable.

Accordingly, the ability to invoke Rule C's *in rem* remedy generally depends on the existence of a maritime lien.[38] If, after a review of a verified complaint, "the conditions for an in rem action appear to exist, the court must issue an order directing the clerk to issue a warrant for arrest of the vessel," which must be delivered to the marshal for service.[39] If a person claiming an interest in an arrested vessel challenges the arrest, the plaintiff has the burden to show why the arrest should not

---

[34] ECF No. 20.
[35] ECF Nos. 25 (Defendants' supplemental brief in support), 26 (Ampelmann's supplemental brief in opposition), 30 (Ampelmann's response to Defendants' supplemental brief) and 31 (Defendants' supplemental reply).
[36] ECF No. 34.
[37] FED. R. CIV. P. SUPP. A. M. C. Rule C(1)(a).
[38] *Ravenna Tankers Pte., SRL v. Omni Ships Pte. Ltd.*, No. CIV.A. 13-127, 2013 WL 2153544, at *3 (E.D. La. May 15, 2013).
[39] FED. R. CIV. P. SUPP. A. M. C. Rule C(3).

be vacated.[40] The arresting party must show that the arrest was justified by "reasonable grounds" or "probable cause."[41]

### III.
### DISCUSSION

**A. Choice of Law.**

    **1. The Parties' Arguments.**

Atlantic Oceanic argues that Ampelmann is not entitled to seize the Vessel because the parties selected Dutch law to govern the Charter Party and Dutch law does not recognize a maritime lien for the supply of necessaries to a vessel.[42] Seizure under Rule C is only available "[t]o enforce any maritime lien"[43] and Ampelmann asserts that it has a maritime lien under CIMLA, i.e., under U.S. law.[44] Atlantic Oceanic argues that Dutch law, not U.S. law, applies to the question of whether a maritime lien exists, and that it is settled in the Fifth Circuit that Dutch law does not recognize a maritime lien for the supply of necessaries to vessels.[45]

Ampelmann responds that the Charter Party's choice-of-law provision only applies Dutch law to disputes arising from the contract and not the question of *in rem* lien rights. It argues that the *in rem* proceeding, by contrast, concerns the existence of a maritime lien and the seizure of the

---

[40] FED. R. CIV. P. SUPP. A. M. C. Rule E(4)(f).
[41] *Cockett Marine Oil Ltd. v. M/V Lion*, No. CIV.A. 11-464, 2011 WL 1833286, at *2 (E.D. La. May 12, 2011)(citations omitted). *See also, Genco Constellation LTD. v. BG Shipping Co. LTD.*, No. 4:23-CV-00365, 2023 WL 2020972, at *2 (S.D. Tex. Feb. 15, 2023), *report and recommendation adopted*, No. 4:23-CV-00365, 2023 WL 2873388 (S.D. Tex. Apr. 10, 2023); *Casillo Commodities Italia S.P.A. v. M/V LONG CHEER*, No. CV 16-16612, 2017 WL 2804925, at *2 (E.D. La. June 28, 2017).
[42] ECF No. 11-1 at 3-5.
[43] FED. R. CIV. P. SUPP. A. M. C. Rule C(1)(a).
[44] ECF No. 1 at 3.
[45] *Belcher Co. of Alabama v. M/V Maratha Mariner*, 724 F.2d 1161, 1164 (5th Cir. 1984)("… ***Dutch law does not recognize the concept of maritime lien*** and, therefore, provides no mechanism by which such a lien can be enforced.") (emphasis added); ECF No. 11-1 at 3-5. The parties each submitted legal opinions by Dutch attorneys, and those opinions agree that Dutch law does not recognize a maritime lien as that term is used in U.S. law. ECF Nos. 11-4, 30-1.

Vessel pursuant to that lien; Ampelmann contends that U.S. law—specifically, CIMLA—governs these *in rem* lien rights, not Dutch law.[46] In this regard, Ampelmann cites *Gulf Trading & Transp. Co. v. Vessel Hoegh Shield*,[47] where the Fifth Circuit appeared to distinguish *in rem* lien rights and *in personam* contract rights.[48] *Gulf Trading* involved a U.S. maritime supplier that provided goods at a U.S. port to a Norwegian vessel pursuant to an agreement with an English charterer. The Fifth Circuit held that U.S. law applied to the question of whether a maritime lien existed and held that the supplier had a valid maritime lien under U.S. law.[49] Ampelmann argues that the same result should obtain here. Additionally, separate from the *in rem* proceeding, Ampelmann argues the Charter Party grants it a lien on the Vessel if Atlantic Oceanic fails to perform under the contract; Ampelmann contends that this lien provision shows that the parties contemplated that seizure might occur.[50]

Atlantic Oceanic replies that *Gulf Trading* is distinguishable because there, the contract did not include any choice-of-law provision, requiring the court to resort to a traditional choice-of-law analysis, and here, the supplier is not a U.S. company.[51] Atlantic Oceanic argues that when a charter party chooses a foreign law, federal courts generally give effect to that choice when determining whether a maritime lien exists, and require specific language to make an exception for applying U.S. law to the maritime lien question.[52] Atlantic Oceanic argues that the Charter Party does not include a sufficient carve-out, so Dutch law applies and no maritime lien exists that can support the Vessel's seizure under Rule C.

---

[46] ECF No. 14 at 2-3.
[47] 658 F.2d 363 (5th Cir. 1981).
[48] ECF Nos. 14 at 2-3; 26 at 13.
[49] *Gulf Trading & Transp. Co. v. Vessel Hoegh Shield*, 658 F.2d 363, 368 (5th Cir. 1981).
[50] ECF No. 14 at 5-6.
[51] ECF No. 16 at 3-6.
[52] ECF Nos. 16 at 5-6; 25.

Ampelmann responds that a maritime lien exists even if Dutch law applies, because Dutch law requires consideration of the parties' intent when interpreting a contract, not just its terms.[53] Ampelmann argues that inclusion of the lien provision in the Charter Party shows that the parties intended and accepted that the Vessel might be seized for nonpayment.[54] Because Dutch law does not recognize a maritime lien, Ampelmann argues that agreeing on this possible outcome implies that the parties intended to provide a U.S. maritime lien as a remedy.[55] Ampelmann argues alternatively that the question has not been answered by Dutch courts, and this Court should allow seizure of the Vessel until it can be decided by a Dutch court or by arbitration.[56]

### 2. Whether the Charter Party's Choice of Dutch Law Governs the Existence of a Maritime Lien.

The question of what law governs whether Ampelmann possesses a maritime lien on the Vessel is addressed first, as it is determinative of the present motion. Atlantic Oceanic argues that if Dutch law applies, then no maritime lien exists because Dutch law does not recognize a maritime lien for the provision of necessaries. Ampelmann argues that U.S. law applies to the question of whether a maritime lien exists, but even if Dutch law applies, Dutch courts could find that the parties intended to subject themselves to U.S. law on the question of whether a maritime lien exists.[57] Accordingly, the parties agree that determining whether Dutch law applies is the controlling question. The Court concludes that Dutch law applies to the question of whether Ampelmann possesses a maritime lien enforceable under Rule C.

---

[53] ECF No. 26 at 5-7.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] Ampelmann's offered legal opinion on Dutch law does not indicate that that law would allow the parties to contract into a maritime lien, only that the question has not been addressed by Dutch courts. ECF No. 30-1.

In addition to Congress' authority to regulate maritime and admiralty matters through statute, the Constitution grants federal courts authority to create and apply maritime law as a matter of federal common law.[58] The statute most relevant to this dispute is CIMLA. In some circumstances, when a maritime contract is breached, CIMLA "affords special protection" to the injured party by granting them a maritime lien.[59] A maritime lien is not a common-law lien on property, but "a special property right in [a] vessel, which grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds."[60] Such a right is only available through operation of CIMLA, and cannot be created by agreement of the parties.[61] In other words, a maritime lien cannot be created by contract. The statutory provisions creating maritime liens are applied "*stricti juris* to ensure that maritime liens are not lightly extended by construction, analogy, or inference."[62]

"In the absence of a contractual choice-of-law clause, federal courts sitting in admiralty apply federal maritime choice-of-law principles derived from the Supreme Court's decision in *Lauritzen v. Larsen*, 345 U.S. 561 (1953) and its progeny."[63] "Where the parties have specified in their contract which law should apply to their transaction, however, 'admiralty courts will

---

[58] *Great Lakes Ins. SE v. Raiders Retreat Realty Co., LLC*, 601 U.S. 65, 69, 144 S. Ct. 637, 642, 217 L. Ed. 2d 401 (2024)(citing U.S. Const., Art. III, § 2, cl. 1; *Norfolk Southern R. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 28, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004); and *Air & Liquid Systems Corp. v. DeVries*, 586 U.S. 446, 452, 139 S.Ct. 986, 203 L.Ed.2d 373 (2019)).
[59] *Liverpool & London S.S. Prot. & Indem. Ass'n Ltd. v. M/V ABRA*, 295 F. Supp. 2d 674, 680 (M.D. La. 2003)(citing *E.A.S.T., Inc. of Stamford, Conn. V. M/V ALAIA*, 876 F.2d 1168, 1174 (5th Cir.1989); *Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d 461, 466 (5th Cir.1984))(alterations omitted).
[60] *Martin Energy Servs., L.L.C. v. Bourbon Petrel M/V*, 962 F.3d 827, 830 (5th Cir. 2020)(quoting *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986) (en banc)).
[61] *ING Bank N.V. v. Bomin Bunker Oil Corp.*, 953 F.3d 390, 395 n.10 (5th Cir. 2020)(citing *Valero Mktg. & Supply Co. v. M/V Almi Sun*, 893 F.3d 290, 292 (5th Cir. 2018); *ING Bank N.V. v. M/V TEMARA*, 892 F.3d 511, 519 (2d Cir. 2018); *Bominflot, Inc. v. The M/V HENRICH S*, 465 F.3d 144, 146 (4th Cir. 2006)).
[62] *Martin Energy Servs.*, 962 F.3d at 831 (quoting *Valero*, 893 F.3d at 292).
[63] *Three Fifty Markets Ltd. v. M/V ARGOS M*, No. CV 23-595, 2024 WL 1827250, at *5 (E.D. La. Apr. 25, 2024).

generally give effect to that choice.'"[64] As a result, "choice-of-law provisions in maritime contracts are presumptively enforceable."[65] "[A]bsent compelling reasons of public policy, a choice-of-law provision in a maritime contract should be enforced."[66] This presumption is subject to specific exclusions—such as when "the chosen law would contravene a controlling federal statute, or conflict with an established federal maritime policy," or if the parties "can furnish no reasonable basis for the chosen jurisdiction."[67] These exceptions do not apply in the present case. Courts generally apply broad choice-of-law clauses not only to the parties' contract but also to the question of whether a party to the contract possesses a maritime lien.[68] While the parties to a contract may select non-U.S. law for the contract generally but then select U.S. law to govern the existence and enforcement of *in rem* rights—such as maritime liens—such carve-outs or exceptions must be explicit. General choice-of-law or lien language will not "trump an unqualified … choice of law provision."[69]

A review of relevant cases is instructive. In *Cockett Marine Oil Ltd. v. M/V Lion*,[70] a United Kingdom-based company provided fuel in Russia to a Greek-flagged and Panamanian-owned vessel that was under charter to a United Kingdom-based company. The contract between the charterer and the fuel provider stated that the contract "and all claims and disputes arising under

---

[64] *Sing Fuels Pte. Ltd. v. M/V Lila Shanghai*, 534 F. Supp. 3d 551, 559 (E.D. Va. 2021) (quoting *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 233 (4th Cir. 2003)); *see also World Fuel Servs. Singapore Pte, Ltd. v. Bulk Juliana M/V*, No. 13-5421, 2015 WL 575201 (E.D. La. Feb. 11, 2015).
[65] *Great Lakes Ins. SE v. Raiders Retreat Realty Co., LLC*, 601 U.S. 65, 76, 144 S. Ct. 637, 646, 217 L. Ed. 2d 401 (2024).
[66] *Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409, 415 (4th Cir. 2009)(citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12-13 (1972); *Lauritzen*, 345 U.S. at 588-89).
[67] *Great Lakes Ins.*, 601 U.S. at 76 (citations omitted).
[68] *See, e.g., Cockett Marine*, 2011 WL 1833286 at *4 (citing *Bominflot*, 465 F.3d; *Marine Oil Trading Ltd. v. MOTOR TANKER PAROS*, 287 F.Supp.2d 638, 644–45 (E.D.Va.2003); *Marine Oil Trading Ltd. v. M/V SEA CHARM*, No. 02–2281, 2003 WL 292309, at *6 (E.D.La. Feb. 10, 2003); *Ocean Marine Mut. Ins. Assoc. (Europe) O.V. v. M/V LIA*, No. 99–2515, 1999 WL 679671, at *3–4 (E.D.La. Aug. 27, 1999)).
[69] *Id.*
[70] No. CIV.A. 11-464, 2011 WL 1833286 (E.D. La. May 12, 2011).

or in connection with [it] shall be governed by English law and any dispute arising out of or in connection with the Agreement shall be subject to the exclusive jurisdiction of the English Courts."[71] The contract also included a lien provision stating that the parties "agreed and acknowledged that a lien over the Vessel is thereby created for the Price of Product supplied" but did not specifically address whether the fuel provider possessed a maritime lien under U.S. law.[72] There, the Eastern District of Louisiana reasoned that the parties agreed to a broad, blanket selection of English law to govern their agreement, and that the general language used for the choice-of-law and lien provisions created no exception to the parties' choice of English law with respect to the existence of maritime liens. In the present case, as in *Cockett Marine*, the Charter Party's choice-of-law and lien provisions are similarly general, and do not carve out any exception to the choice-of-law clause for the creation or enforcement of a maritime lien.

In contrast, in *Three Fifty Markets Ltd. v. M/V ARGOS M*,[73] the contract provided that "[t]he laws of the United States, including but not limited to [CIMLA], shall always apply with respect to the existence of a maritime lien, regardless of the country in which the Seller takes legal action."[74] The Eastern District of Louisiana held that this explicit choice of U.S. law and reference to a maritime liens obviated the need for any further choice-of-law analysis.[75] The Charter Party in the present case provides no such "carve-out" designating U.S. law or CIMLA to govern whether Ampelmann possesses a maritime lien.

In *Sembawang Shipyard, Ltd. v. Charger, Inc.*,[76] a Singapore company provided repair services in Singapore under a contract with the Liberian owner of the vessel. In response to

---

[71] *Id.* at *1.
[72] *Id.* at *4.
[73] No. CV 23-595, 2024 WL 1827250 (E.D. La. Apr. 25, 2024).
[74] *Id.* at *6.
[75] *Id.*
[76] 955 F.2d 983 (5th Cir. 1992).

nonpayment, the provider later seized the vessel in the Eastern District of Louisiana. The contract provided that "any dispute" arising thereunder would be "governed by the Law of Singapore." The Fifth Circuit held that this broad language applied Singapore law to both *in rem* and *in personam* claims arising from the contract, and therefore Singapore law governed the question of whether a maritime lien arose.[77] Here, the contract includes similarly broad language in providing that the Charter Party "shall be governed by and construed in accordance with" Dutch law. Ampelmann suggests that because the choice-of-law provision in the Charter Party does not expressly distinguish between *in rem* and *in personam* claims, either different laws were intended to apply to each type of claim, or the clause is ambiguous and must be construed according to law of the forum. This argument fails under *Sembawang*. Under *Sembawang,* courts should not read this distinction into a general choice-of-law provision.

This general language contrasts with specific choice-of-law language of the kind at issue in *Liverpool & London S.S. Prot. & Indem. Ass'n Ltd. v. QUEEN OF LEMAN MV*.[78] There, the plaintiff insurer's contract with the vessel's owners and operators created a right to assert a lien against the vessel for unpaid premiums, and the insurer seized the vessel under Rule C. The parties agreed that the insurance contract provided generally that it would be governed by English law, but disputed whether English law also applied to the existence of a maritime lien.[79] Importantly, the contract gave the insurer the right "to enforce its right of lien in any jurisdiction in accordance with local law in such jurisdiction" and the right "to take action and/or commence proceedings in any jurisdiction to enforce its right of lien on ships or to otherwise obtain security by seizure, attachment or arrest of assets for any amounts owed."[80] Considering that the contract specifically

---

[77] *Id*. at 986.
[78] 296 F.3d 350 (5th Cir. 2002).
[79] *Id.* at 353.
[80] *Id.*

allowed the insurer to "commence proceedings in any jurisdiction to enforce its right of lien" and to enforce that right "in accordance with local law in such jurisdiction," the Fifth Circuit concluded that the contract created a specific carve-out or exception to the general choice of English law for the question of whether a maritime lien existed.[81] No similar carve-out exists in the present case.

In *Bominflot, Inc. v. The M/V HENRICH S*,[82] the plaintiff, an international fuel supplier, provided fuel to a German-flagged and owned vessel under charter to a Taiwanese company. The fuel supplier later arrested the vessel in the District of South Carolina, asserting that it possessed a maritime lien. The contract at issue stated that it was made "subject to the law and jurisdiction of the courts of England, or other law and jurisdiction as specified" in the contract.[83] The contract also broadly granted the supplier the right "to assert and enforce a lien against the receiving vessel" for the fuel provided.[84] Finally, the contract allowed the fuel supplier to take "any action as it shall in its sole discretion consider necessary to enforce, safeguard or secure its rights under the Contract in any court or tribunal in any state or country."[85] The plaintiff supplier cited *QUEEN OF LEMAN* to argue that the language in the contract allowing it to bring an action in any country to enforce its lien rights against the vessel overrode the parties' selection of English law to govern the contract with respect to the existence and enforcement of maritime liens.[86] The Fourth Circuit rejected that argument, holding that the language allowing the supplier to bring an action in any jurisdiction constituted a forum selection clause rather than a choice-of-law clause, and thus did not override

---

[81] *Id.*
[82] 465 F.3d 144 (4th Cir. 2006).
[83] *Id.* at 146.
[84] *Id.*
[85] *Id.*
[86] *Id.* at 149.

the choice of English law for all other questions arising from disputes relating to the contract, including whether a maritime lien existed.[87]

Here, the choice-of-law and lien provisions in the Charter Party are not sufficiently specific to create an exception to the parties' blanket selection of Dutch law. The parties do not dispute that Dutch law generally governs the contract. Read together, Box 33 of Part I and Clause 37 of Part II of the Charter Party show that the parties agreed that the contract is "governed by and construed in accordance with" Dutch law. This language does not distinguish between *in rem* and *in personam* claims, and the Court will not read that distinction into the contract.[88] The contract gives Ampelmann a lien over the Vessel, but does not, for example, specify a maritime lien, refer to liens available under U.S. law, or allow Ampelmann to pursue any lien available in the jurisdiction where the Vessel is seized.

Ampelmann attempts to parse the language of the choice-of-law clause in the Charter Party by arguing that the parties provided that Dutch law applied to questions involving the *interpretation* of the contract but they did not expressly state that *disputes* arising from the contract were to be governed by Dutch law. In this regard, Ampelmann points out that Clause 37 of Part II of the Charter Party states that the contract is "governed by and construed in accordance with" Dutch law, and asserts that the term "disputes" is only used in connection with the selection of an arbitration forum. This argument is without merit in light of Box 33 of Part I, which expressly uses

---

[87] *Id.* at 149-50.
[88] At the hearing, Ampelmann argued that the contract does distinguish between *in rem* and *in personam* claims because the failure to specify that Dutch law applies to *in rem* procedure shows the parties intended to allow *in rem* claims under U.S. law. The Court is not persuaded that the contract's lack of mention of *in rem* or *in personam* claims or procedures shows the parties' intent to draw that distinction. Moreover, even if the Court were persuaded that this failure constitutes an ambiguity in the contract that is susceptible of resolution under the forum law, Louisiana law provides that ambiguities are construed against the drafter, which in this case is Ampelmann. *Matter of Aries Marine Corp.*, No. CV 19-10850, 2024 WL 4843739, at *7 (E.D. La. Nov. 20, 2024)(citing *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 764 (La. 1994); *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 207 (5th Cir. 2007)).

the term "disputes" and selects Dutch law. Again, the Charter Party does not create an exception to the Dutch choice-of-law clause for maritime liens.

Ampelmann's reliance on *Gulf Trading* to argue that the law governing a contract is distinct from the law governing *in rem* rights is misplaced.[89] Ampelmann is correct that *Gulf Trading* distinguishes between "the express contract to provide bunkers," which governed disputes related to that contract, and "the application of a maritime lien" in favor of the fuel supplier, which arises only by operation of statute.[90] However, *Gulf Trading* is factually distinguishable because there, ***the fuel agreement did not include a choice-of-law provision***. Given the lack of a forum selection clause, the court was required to conduct a conflicts analysis to determine which law applied. In that regard, the court assessed whether there was evidence sufficient to "permit the inference that the supplier purposefully intended to forego the valuable privilege which [U.S.] law accords."[91] Here, the Charter Party's choice-of-law and lien provisions support the inference that Ampelmann intended to avail itself of the privileges available under Dutch law, not U.S. law. Unlike *Gulf Trading*, the Court need not conduct a general conflicts analysis given the parties' express choice-of-law selection. Simply put, the standards applied by the courts in *Cockett Marine*, *Sembawang Shipyard*, and *Bominflot* govern the Court's decision in the present case, not *Gulf Trading*.

Ampelmann alternatively argued at the hearing that inclusion of the lien provision reflects the parties' intent to submit to U.S. law on maritime liens because failure to recognize a maritime lien would render the contractual lien provision meaningless. This argument fails at the outset because Ampelmann appears to argue that the Charter Party's contractual lien provision essentially creates an enforceable maritime lien. But, again, maritime liens cannot be created by contract.

---

[89] ECF No. 26 at 10.
[90] *Gulf Trading*, 658 F.2d at 366.
[91] *Id.* at 368 (quoting *Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co.*, 261 F.2d 861, 867 (5th Cir. 1958)).

Moreover, the legal opinion provided by Atlantic Oceanic reveals that Dutch law does recognize rights that can be asserted against a vessel, and Dutch law provides for attachment of a vessel analogous to attachment under Rule B.[92] Accordingly, the Charter Party's lien provision is not rendered ineffective by the unavailability of a maritime lien and the remedies afforded under Rule C.

In short, the Court is bound to give effect to the party's selection of Dutch law to govern all disputes arising out of the Charter Party, including whether a maritime lien exists.

### B. Dutch Law Does Not Recognize a Maritime Lien for the Supply of Neccesaries.

Given that Dutch law applies to the question of whether Ampelmann possesses a valid maritime lien, the Court turns to Dutch law. As noted above, the parties have submitted legal opinions on Dutch law. These opinions are sufficient to fully inform the Court on the relevant law selected by the parties, and these legal opinions support Atlantic Oceanic's position that Ampelmann lacks a maritime lien enforceable under Rule C. The Court also notes that the Fifth Circuit has similarly held that Dutch law does not recognize a maritime lien under the circumstances of the present case.[93] Accordingly, Atlantic Oceanic's motion to quash the arrest warrant for the Vessel will be granted.

---

[92] ECF No. 11-4. In *Sembawang Shipyard*, the Fifth Circuit explained the distinction between proceedings conducted under Rule B and Rule C:

> Rule B is an adjunct to a claim *in personam*. When the defendant cannot "be found within the district," the plaintiff may "attach the defendant's goods and chattels." Supplemental Rule B. Thus, the plaintiff's claim is against the person, not the thing, but if the person cannot be found in the district, the plaintiff is protected by the ability to proceed against the thing. Such a proceeding is an action *quasi in rem*. In contrast, Supplemental Rule C is a true proceeding *in rem*. The claim is against the thing itself.

955 F.2d at 984–85.
[93] *Belcher Co. of Alabama*, 724 F.2d at 1164 ("… **Dutch law does not recognize the concept of maritime lien** and, therefore, provides no mechanism by which such a lien can be enforced.") (emphasis added).

C. **Whether the System was Provided to the Vessel.**

Alternatively, Atlantic Oceanic argues that even if U.S. law applies, Ampelmann does not have a valid maritime lien against the Vessel.[94] Atlantic Oceanic asserts that a maritime lien for provision of necessaries only arises when the contract shows the necessaries were provided to a specific vessel, and here the Charter Party hires the System to Atlantic Oceanic, not the Vessel, so no maritime lien exists.[95] Ampelmann argues that even if the Charter Party does not mention the Vessel specifically, Ampelmann's invoices and work orders, as well as the procedures and regulations with which Atlantic Oceanic had to comply, show that the parties always intended for the System to be employed on the Vessel and no other ship.[96]

Given the Court's determination that Ampelmann does not have a maritime lien on the Vessel, it need not determine whether the System was provided to the Vessel.

---

[94] ECF No. 11-1 at 6-9.
[95] ECF Nos. 11-1 at 6-9; 31-2 at 19-31.
[96] ECF No. 14 at 6-9; 26 at 16-19.

IV.
## Conclusion

For the reasons stated above,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Defendants' Motion to Vacate Vessel Arrest [ECF No. 11] is GRANTED. The Warrant for Arrest *In Rem* previously issued in this matter [ECF No. 9] is QUASHED. The order prohibiting movement of the Vessel is VACATED.

**THUS DONE AND SIGNED** in Chambers this 3rd day of February, 2025.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE